39 F.Supp. 436 (1941)
In re MISSOURI PAC. R. CO.
No. 6935.
District Court, E. D. Missouri, E. D.
June 20, 1941.
*437 *438 Alexander & Green, of New York City, for Bankers Trust Co. and others.
Chadbourne, Wallace, Parke & Whiteside, of New York City, for Manufacturers Trust Co.
Jeffries, Simpson & Plummer, of St. Louis, Mo., for Benj. F. Edwards.
W. Lloyd Kitchel, of New York City, for Bondholders Protective Committee.
White & Case, of New York City, for Bankers Trust Co.
Larkin, Rathbone & Perry, of New York City, for Central Hanover Bank & Trust Co.
Cravath, De Gersdorff, Swaine & Wood, of New York City, for Bondholders Protective Committee, New Orleans, T. & M. Ry. Co. first mortgage.
T. M. Pierce and S. Mayner Wallace, both of St. Louis, Mo., for Mississippi Valley Trust Co.
Cassius M. Clay, of Washington, D. C., for Reconstruction Finance Corporation.
Ernest S. Ballard, of Chicago, Ill., for Missouri Pac. R. Co., debtor.
Shearman & Sterling, of New York City, for Bondholders Protective Committee, Missouri Pacific Railroad Co. General Mortgage.
Root, Clark, Buckner & Ballantine, of New York City, for Commercial Nat. Bank & Trust Co. of New York.
Milbank, Tweed & Hope, of New York City, for City Bank Farmers Trust Co., and another.
Davis, Polk, Wardwell, Gardiner & Reed, of New York City, for Guaranty Trust Co. of New York.
Miller, Owen, Otis & Bailly, of New York City, for New York Trust Co.
*439 Bryan, Williams, Cave & McPheeters, of St. Louis, Mo., for St. Louis Union Trust Co. and another.
Wright, Gordon, Zachry & Parlin, of New York City, for Chemical Bank & Trust Co.
Winthrop, Stimson, Putnam & Roberts, of New York City for Bankers Trust Co.
A. L. Rittenberg, of Chicago, Ill., for M. Ernest Greenebaum, Jr., and another.
Oliver & Donnally, of Washington, D. C., for Savings Bank Trust Co.
Daniel Willard, Jr., of Washington, D. C., for Railroad Credit Corporation.
Luther M. Walter, of Chicago, Ill., for Protective Committee for holders of Missouri Pacific common stock.
Emmet D. Borden, of Washington, D. C., for Missouri overcharge claimants.
Kurzman & Frank, of New York City, for executors of estate of J. F. Dewald.
Lord, Day & Lord, of New York City, for Corn Products Refining Co. et al.
John S. Burchmore, of Chicago, Ill., for R. W. Higgins.
Chas. H. Griffiths, of New York City, for Cornelius C. Kroll et al.
Hennings, Green, Henry & Hennings, of St. Louis, Mo., for Reconstruction Finance Corporation.
Russell L. Dearmont, of St. Louis, for Guy A. Thompson.
MOORE, District Judge.
The Missouri Pacific Railroad Company, the primary debtor in this proceeding, is a railroad corporation organized under the laws of the State of Missouri. Said debtor filed its petition with this Court on March 31, 1933, stating among other things, that it was a common carrier by railroad, engaged in the transportation of persons and property in interstate commerce in the States of Missouri, Arkansas, Colorado, Illinois, Kansas, Louisiana and Oklahoma; that it maintained its principal operating office in the City of St. Louis, Missouri, in the Eastern Division, Eastern Judicial District of Missouri; that it was unable to meet its debts as they matured and desired to effect a plan of reorganization, pursuant to Section 77 of Chapter VIII of the Acts of Congress relating to Bankruptcy, 11 U.S.C. A. § 205. The Court approved the petition as properly filed and authorized said debtor to continue in the possession and control of its properties and assets. Thereafter, on the same day, New Orleans, Texas & Mexico Railway Company, a railroad corporation organized under the laws of the State of Louisiana, filed its petition with this Court, stating, among other things, that Missouri Pacific Railroad Company owned approximately 94% of its capital stock; that it was unable to meet its debts as they matured and that it desired to effect a plan of reorganization in connection with, or as a part of, the plan of reorganization of Missouri Pacific Railroad Company, pursuant to the provisions of said Section 77 of the Bankruptcy Act. The Court approved the petition as properly filed under Section 77 of the Act and in this proceeding. On the same day, International-Great Northern Railroad Company filed its petition, stating that it was a railroad corporation organized under the laws of the State of Texas; that Missouri Pacific Railroad Company owned indirectly through an intervening medium, to-wit: New Orleans, Texas & Mexico Railway Company, all of its capital stock; that it was unable to meet its debts as they matured and desired to effect a plan of reorganization, pursuant to said Section 77, in connection with, or as a part of, the plan of reorganization of said Missouri Pacific Railroad Company. The Court approved the petition as properly filed under the Act and in this proceeding.
Subsequently, as hereinafter noted, twenty-three other railroad corporations filed their petitions in this proceeding, stating that more than a majority of the capital stock of each of said railroad companies was owned by Missouri Pacific Railroad Company, debtor, either directly or indirectly through an intervening medium; that they were unable to meet their debts as they matured and that they desired to effect a plan of reorganization in connection with, or as a part of, the plan of reorganization of said Missouri Pacific Railroad Company, debtor, pursuant to said Section 77. The Court approved said petitions as properly filed under the Act and in said proceeding in which the Petition of Missouri Pacific Railroad Company had theretofore been filed. The petitions of said subsidiary debtors were filed and approved as follows:
On May 2, 1933, Missouri Pacific Railroad Corporation of Nebraska; the Beaumont, Sour Lake and Western Railway Company; the St. Louis, Brownsville and Mexico Railway Company; San Antonio, Uvalde and Gulf Railroad Company; and Houston North Shore Railway Company;
*440 On June 30, 1933, the Missouri-Illinois Railroad Company;
On June 4, 1936, the Booneville, St. Louis and Southern Railway Company;
On December 1, 1937, Asherton and Gulf Railway Company; Asphalt Belt Railway Company; Houston and Brazos Valley Railway Company; Iberia, St. Mary & Eastern Railroad Company; New Iberia & Northern Railroad Company; Austin Dam and Suburban Railway Company; the Orange & Northwestern Railroad Company; Rio Grande City Railway Company; San Antonio Southern Railway Company; San Benito and Rio Grande Valley Railway Company; Cairo and Thebes Railroad Company; the Chester and Mt. Vernon Railroad Company; Fort Smith Suburban Railway Company; Marion & Eastern Railroad Company; Sugar Land Railway Company; and Natchez & Southern Railway Company.
On June 22, 1933, the Court appointed L. W. Baldwin and Guy A. Thompson temporary trustees, effective July 1, 1933, and on July 25, 1933, said appointment was made permanent. Thereafter, on December 26, 1935, the resignation of L. W. Baldwin as co-trustee of the debtor companies was accepted and Guy A. Thompson was continued thereafter as the sole trustee.
On October 21, 1935, the three principal debtor railroads, to-wit: the Missouri Pacific Railroad Company, hereinafter referred to as the "`Missouri Pacific," the New Orleans, Texas & Mexico Railway Company, hereinafter referred to as the "New Orleans," and the International-Great Northern Railroad Company, hereinafter referred to as the "International," filed with the Court a plan for their reorganization, and the reorganization of their subsidiary railroad companies, comprising all of the petitioning debtor companies. This plan was subsequently filed with the commission. Thereafter, the Protective Committee for Missouri Pacific First and Refunding Bondholders, hereinafter referred to as "First and Refunding Committee," filed a proposed plan of reorganization which was later superseded by a modified plan filed by said Committee. A Committee representing common stockholders also submitted a plan to the Interstate Commerce Commission as an exhibit at the hearings held by said Commission, and debtor railroads also submitted a modified plan to the commission as an exhibit, but not as a substitute for their original plan filed herein.
After extensive hearings and other proceedings before the Interstate Commerce Commission, said Commission, under date of January 10, 1940, issued its report and order approving a plan of reorganization of all of said debtor companies, except the Missouri-Illinois Railroad Company. Said report and order were filed with this Court on January 19, 1940. Thereafter, under date of April 9, 1940, said Commission issued a supplemental report and a supplemental order approving a modified plan of reorganization, which was filed with this Court on April 22, 1940.
On April 30, 1940, the Court entered its order requiring all parties in interest having any objections to said proposed plan of reorganization, to file detailed and specific objections in writing to said plan and their claims, if any, for equitable treatment in the office of the Clerk of the Court on or before June 3, 1940. Said order further provided that all petitions for allowance for compensation for services rendered or for expenses (including reasonable attorneys' fees) incurred either under Clause (12) of subsection c of Section 77 of the Bankruptcy Act, or otherwise, should be filed in the office of the Clerk of the Court on or before June 3, 1940. Notice was duly given as required by the terms of the order. Pursuant to the terms of said order, a number of objections to the plan of reorganization and claims for equitable treatment were duly filed by various parties in interest. The time for filing petitions for allowance was later extended to June 20, 1940, and on or before that time, numerous such claims were filed with the Clerk of the Court and certified copies thereof transmitted to the Interstate Commerce Commission for the fixing of maximums within which allowances might be made thereof.
On June 9, 1940, a hearing was held on all objections and claims for equitable treatment to said plan of reorganization. Testimony was heard on that day and the hearing then adjourned until October 7, 1940, the Court requiring all parties desiring to file briefs to do so prior to the date of the adjourned hearing. On October 7, 1940, said hearing was resumed and after extensive arguments by counsel for various parties in interest which were concluded on October 10, 1940, the hearing on objections to the plan was concluded and the matter continued for consideration of petitions for allowances, the maximum allowances not having been fixed by the Interstate Commerce Commission. On January 17, 1941, *441 the Commission entered its report and order fixing maximums within which allowances might be made to parties in interest which was duly filed with the Clerk of the Court.
The three principal units making up the Missouri Pacific System are the Missouri Pacific, the New Orleans, and the International. These companies, with their subsidiaries, own approximately 9,556 miles of railroad. Including leased lines, the System has approximately 10,218 miles of operated railroad and trackage rights over approximately 500 miles. The Missouri Pacific also controls, through majority stock ownership, the Texas & Pacific Railway Company, which owns approximately 1,800 miles of railroad and which is independently operated. The Missouri Pacific also owns a controlling interest in the Missouri-Illinois Railroad Company, which, with its subsidiary, the Mississippi & Bonne Terre Railway Company, own about 195 miles of railroad. The Missouri-Illinois Railroad Company, debtor, is not included in the plan of reorganization. The Missouri Pacific also owns one-half of the controlling interest in the Denver & Rio Grande Western Railroad Company, the other one-half of which is owned by the Western Pacific Railroad Corporation. The Denver Company operates about 2,800 miles of railroad, and reorganization proceedings for it are pending in the United States District Court for the District of Colorado.
It will not be necessary for the purposes of this opinion to further describe the properties comprising the Missouri Pacific System. Neither will the reasonable limits of this opinion permit any detailed presentation of the involved financial structure of the present System. It should be noted that there are more than eighty outstanding issues of evidences of indebtedness of the present System and more than thirty different kinds of equity securities now outstanding. The total annual charges of the present System total $29,108,019, of which $24,770,052 is fixed interest, $828,462 is contingent interest, and $3,509,505 is represented by preferred stock dividends.
Clause C of the Commission's supplemental order provides that the new or reorganized company shall have the following capitalization:
"C. The capitalization of the new company after consummation of the plan shall consist substantially of the equipment obligations then outstanding of any or all of the aforesaid companies or of the trustee thereof, amounting as of January 1, 1940, to $13,715,000, which shall be assumed by the new company; approximately $158,700,500 of first-mortgage bonds of the new company, of which $31,779,500 shall be series-A 3¾-per-cent bonds and $126,921,000, series-B 4-per-cent bonds; $711,500 of Plaza-Olive Building first-mortgage bonds; approximately $14,433,500 of 10-year collateral trust secured notes; approximately $120,661,000 of general mortgage income bonds, of which approximately $22,727,000 shall be series-A cumulative 4-percent bonds, and approximately $97,934,000, series-B convertible-income 4½-percent bonds; approximately $39,189,500 of prior-preferred $100 par value 5-percent stock; approximately 763,115 shares of $5 a year dividend no-par second-preferred stock; and approximately 1,367,564 shares of no-par common stock, together with such additional shares of common stock as may be issued, as hereinafter provided, in satisfaction of allowed claims of general unsecured creditors of the debtors not entitled to preference, upon the terms hereinafter prescribed."
Appendix E attached to the report of the Interstate Commerce Commission of January 10, 1940, sets forth in tabulated form the various claims of creditors and stockholders, except those of general unsecured creditors of the debtor railroads, the amount of each claim with interest accrued to January 1, 1940, and the distribution of new securities under the Commission's plan of reorganization. A printed copy thereof is hereto attached, marked "Exhibit A" and made a part hereof.
Attention should be directed to the fact that certain interest payments have been made on certain of the claims since the aforementioned tabulation was prepared, and also to the fact that it does not include certain obligations represented by certain terminal guarantees.
Eighteen objections to the plan of reorganization were filed by various creditor interests. A claim for equitable treatment stating the position of the Reconstruction Finance Corporation toward the plan was also filed. Two of the interests filing objections, urged approval of the plan at the hearing. In the end, the plan was supported by the First and Refunding Committee, the New Orleans, Texas & Mexico Committee, the Reconstruction Finance Corporation, the Manufacturers Trust Company, corporate trustee under the first and refunding mortgage, and on the argument, counsel for Benjamin F. Edwards, individual trustee under the first and refunding mortgage, *442 while not taking any position on the allocation of the securities provided for under the terms of the plan, urged that the stockholders were not entitled to participate in this reorganization. Through formal objections filed, as well as in oral arguments at the hearing, objections to the plan were urged by debtor, the protective committee for holders of common stock of the Missouri Pacific, the General Mortgage Bondholders Protective Committee, Chemical Bank & Trust Company, corporate trustee for the 5½% secured serial bonds, executors of the estate of J. F. Dewald, holders of certain of the 5¼% secured serial bonds, Conan trust, holder of certain first and refunding bonds, Commercial National Bank & Trust Company, corporate trustee for 5½% convertible bonds, Irving Trust Company, corporate trustee under the New Orleans, Texas & Mexico First Mortgage, Latshaw Trust, et al., holders of certain New Orleans, Texas & Mexico Bonds, City Bank Farmers Trust Company, corporate trustee under International-Great Northern First Mortgage, International-Great Northern First Mortgage Bondholders Protective Committee, Reserve Loan Life Insurance Company, et al., holders of certain International-Great Northern First mortgage bonds, Corn Products Refining Company, owner of certain International-Great Northern first mortgage bonds, New York Trust Company, corporate trustee under International-Great Northern adjustment mortgage, St. Louis Union Trust Company, corporate trustee, and the committee for holders of Little Rock & Hot Springs Western first mortgage bonds, and the Railroad Credit Corporation.
Before discussing in any detail the objections which are urged against the approval of the plan of reorganization, it may be well to consider briefly the requirements of the Act setting forth the conditions which must be met before the plan may be approved by the Court.
Subsection e of Section 77 provides that the Judge shall approve the plan certified to the Court by the Commission, if satisfied that: "(1) It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land, regarding the participation of the various classes of creditors and stockholders; (2) the approximate amounts to be paid by the debtor, or by any corporation or corporations acquiring the debtor's assets, for expenses and fees incident to the reorganization, have been fully disclosed so far as they can be ascertained at the date of such hearing, are reasonable, are within such maximum limits as are fixed by the Commission, and are within such maximum limits to be subject to the approval of the judge; (3) the plan provides for the payment of all costs of administration and all other allowances made or to be made by the judge, except that allowances provided for in subsection c, paragraph (12) of this section, may be paid in securities provided for in the plan if those entitled thereto will accept such payment, and the judge is hereby given power to approve the same."
In approaching consideration of the provisions of the plan and in considering the objections which are urged against its approval, it should be borne in mind that the Act does not require that a perfect plan be accomplished. There is no mathematical formula that can be followed to reach a perfect result. Nor is it given to the Court to say that in its opinion some other or different plan might be better than the one before it, if that plan is essentially sound.
The initial duty and responsibility for consideration and approval of a plan rests with the Interstate Commerce Commission. By training and experience, the Commission is in a preferred position to consider the reasonableness and soundness of the provisions of such a plan. Recognizing this to be true, the Court will give great weight to the recommendations of the Commission on the technical phases of the plan and will concern itself primarily with the legal questions involved.
Many objections have been urged against the plan by able counsel representing debtor and certain parties in interest to these proceedings. Four major objections are presented by debtor. It first urges that the plan must be disapproved for the reason that according to its terms, it is to become effective as of January 1, 1940, instead of as of April 1, 1933, the date of the institution of these proceedings. It is contended that the Statute requires that the plan be effective as of the date of the beginning of the reorganization proceedings. This same contention is also made by the protective committee for holders of Missouri Pacific common stock.
*443 As far as the Court is advised, this contention is first raised in this proceeding in the objections filed to the approval of the plan. Debtor's original plan and also its modified plan provided for an intermediate effective date. In none of the reorganization proceedings where plans have been approved has the date of the institution of the proceedings been selected as the effective date. This would seem to justify the inference that, as a practical consideration, an effective date which falls near the time of the promulgation of a plan, is most satisfactory.
It is easy to envision the confusion and difficulties that the debtor trustee and administrative Court would face, if they were forced to administer the debtor estate for years with the knowledge that at some time in the remote future, unknown demands would be made upon current earnings of the estate. No capital expenditures could be safely made for fear they might result in the expenditure of funds which, under a plan to be approved in the future, might be needed to meet fixed charges on new securities.
There is no provision of Section 77 which requires that the date of the institution of the proceedings shall also be the effective date of the plan. It would seem reasonable to assume that if Congress had so intended it would have included such a provision in the Act.
This same objection was urged against the Chicago, Milwaukee, St. Paul and Pacific Railroad Company plan of reorganization. D.C. 36 F.Supp. 193, 203. Judge Igoe in overruling the objection, among other things, said: "Moreover, such proposed relation back and the consequent disallowance of interest are contrary to the uniform rule applying in insolvency proceedings generally that, in the case of secured creditors, unpaid interest accruing during the proceedings must be included in the claim."
In Consolidated Rock Products Company v. DuBois, infra [61 S.Ct. 685, 85 L.Ed. ___] Mr. Justice Douglas said: "The instant plan runs afoul of that principle. In the first place, no provision is made for the accrued interest on the bonds. This interest is entitled to the same priority as the principal."
The Court is of the opinion that January 1, 1940, is an appropriate effective date for the plan and that the selection of said date is in accordance with the law applicable in such proceedings.
Debtor's next contention is that the plan discriminates unfairly against Missouri Pacific preferred and common stocks and in favor of several other classes of interests, which are entitled to no better treatment than the Missouri Pacific stock. After carefully reading and considering the report of the Commission and the provisions of the proposed plan, the Court is of the opinion that the plan does not so discriminate against said stock.
Debtor next urges that the plan violates the Statute for the reason it does not provide warrants for the portions of claims of creditors and stockholders that are not satisfied by the issuance of new securities.
Clause (3) of Subsection b of Section 77, in dealing with the contents of a Plan, provides that it, "(3) may include, for the purpose of preserving such interests of creditors and stockholders as are not otherwise provided for, provisions for the issuance to any such creditor or stockholder of options or warrants to receive, or to subscribe for, securities of the reorganized company in such amounts and upon such terms and conditions as may be set forth in the plan."
Clearly this provision for options or warrants is permissive and not mandatory. A plan may provide for the issuance of warrants for the purpose of preserving the interests of creditors and stockholders in the estate. They must have a present existing interest before the plan may make such provision for them. In this case, the Commission has found that the equity of the stockholders is without value. This finding is clearly supported by the evidence before the Commission. It follows that since the stockholders interest has been extinguished there is no basis for the issuance of options or warrants to them.
Debtor's final objection to the plan is that it violates the Statute and must be disapproved for the reason that the Commission failed to determine the value of the properties in reorganization. Debtor contends that it is necessary for the Commission to determine the value and certify the same to the Court in its report on the plan, under the mandatory provisions of the Statute. The last paragraph of subsection e of Section 77 provides:
"If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan. The value of any *444 property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts."
In this connection it should be noted that subsection b (4) of Section 77 requires that the plan of reorganization "shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings, experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof."
While the determination of value is not mandatory in every case, it is required where such a determination is necessary for any purpose. The reorganization plan in the instant case proposed the elimination of the interest of Missouri Pacific stockholders. To justify such treatment it would seem necessary to find that the value of the property was insufficient to show any present value in the stock. As hereinbefore quoted, the Act prescribes the basis for determination of such value. Did the Commission make any necessary finding of value in this case? If so, was it supported by substantial evidence offered in these proceedings?
In the Commission's report of January 10, 1940, at page 12147 of the printed record, it says: "Upon consideration of the evidence as to the value of the physical properties, investments in other companies, and past and prospective earnings of the debtors, we find that the capitalization of the proposed new company as of January 1, 1940, should not exceed approximately $560,000,000."
We quote further from said report at page 12150 of the printed record, as follows: "From a consideration of the investment accounts of the three groups of railroads, the statements of elements of value and of their past, present and prospective earnings, as well as all other pertinent facts of record in this proceeding, we conclude and find that, upon a basis of separate reorganization of each of the three groups of railroads comprising the Missouri Pacific system, a total permissible capitalization of about $463,000,000 would not be excessive for the Missouri Pacific; about $67,000,000 for the New Orleans; and about $50,000,000 for the International. While the total of these separate capitalization is $580,000,000 as compared with a capitalization of about $560,000,000 heretofore found by us permissible for the new consolidated company, the latter amount is determined after elimination of duplications due to ownership by one debtor of obligations of another as in the case of the Missouri Pacific's ownership of New Orleans first mortgage bonds, advances to the New Orleans (mostly pledged with the Finance Corporation) and of nearly 95 percent of the New Orleans' capital stock. The obligations evidencing such intergroup duplications would not be capitalized in the new consolidated company."
A further examination of the report discloses that these findings by the Commission were arrived at after consideration of substantial evidence as to earnings, book value, value of investments, cost of reproduction new less depreciation, original cost of the property and other relevant facts. Clearly this finding of the Commission which fixes the capitalization of the reorganized company at $560,000,000 is a finding of value. It fully meets the requirements of the Act in this particular.
The protective committee for holders of common stock of Missouri Pacific Railroad Company offered substantially the same objections to the plan that were urged by debtor. At the hearing held on July 9, 1940, counsel for said committee made a motion that the case be referred back to the Commission on the ground that the Commission had failed to certify the value to the Court as required by the Act. In accordance with the views herein expressed said motion will be denied.
Objection is offered to approval of the plan of reorganization by the Irving Trust Company, trustee, under the New Orleans, Texas & Mexico first mortgage, and by the Latshaw trust, et al., holders of certain of said first mortgage bonds, on the ground that the plan is not fair and equitable and does not afford due recognition to the rights of holders of said first mortgage bonds; that it is unjustly discriminatory against said bondholders inasmuch as it offers them only approximately 46.7% of their claim in new *445 fixed interest obligations and because adequate consideration has not been given to a comparison of New Orleans earnings with earnings of the Missouri Pacific and the International, particularly in recent years. On the other hand, counsel for the trustee of the Conan trust, holder of a substantial amount of Missouri Pacific first and refunding bonds, objects to the plan primarily on the ground that the treatment given New Orleans bondholders under the plan is too favorable and therefore discriminates against Missouri Pacific bondholders. The Bondholders' Protective Committee for New Orleans, Texas & Mexico bondholders urges approval of the plan and takes the position that the treatment received by New Orleans bondholders, while not liberal, is fair.
It is urged by New Orleans objectors that the so-called "Gulf Coast Lines Group" are a completely independent railroad in the sense that they can be separately operated; that no reason exists why the Gulf Coast Lines have to be reorganized as part of a Missouri Pacific System and that this justifies the closest scrutiny of the treatment which is offered this interest under the plan. It is urged that recent earnings of the Gulf Coast Lines are so favorable that it is apparent they are not receiving an interest in the proposed reorganization comparable to the contribution which they are making to the proposed reorganized company.
A careful reading of the Commission's Report discloses that consideration was given by the Commission to all of the matters presented here in the form of objections to the treatment received by the New Orleans bondholders under the plan. While the earnings available for payment of interest for the entire year of 1937 and for the year 1938 and the first nine months of 1939 were not reported at the time the hearings before the Commission were held, it is a fact that this information was supplied to the Commission prior to the filing of their report and is specifically referred to in said report. The report of the Commission comments upon the fact that the earnings of the Gulf Coast Lines for the year 1935 were drastically reduced by certain unusual conditions which were not likely to recur. The Commission also took into consideration the fact that the Gulf Coast Lines group could be separately operated. As a matter of fact, in arriving at the total permissible capitalization of the System Lines, a separate figure was given for each of the three major units. After carefully considering the report and findings of the Commission, the objections filed and the able arguments of counsel, the Court is of the opinion that the treatment accorded the New Orleans interests under the plan is fair and equitable and fully supported by the evidence.
Objections to the plan were presented by the mortgage trustee and the committee for the protection of the Little Rock, Hot Springs and Western bonds. These bonds are secured by a first lien on approximately fifty-seven miles of railroad running from Little Rock to Benton and from Benton to Hot Springs in the State of Arkansas. There are $1,140,000 of these bonds outstanding. Since these bonds were issued the equity has been divided and the line from Benton to Hot Springs, which is approximately thirty-one miles in length is now owned by the Missouri Pacific and the line from Little Rock to Benton of approximately twenty-six miles is now owned by the Rock Island, Arkansas & Louisiana, a subsidiary of the Chicago, Rock Island & Pacific. When the equity was divided, the Missouri Pacific received notes of the subsidiary guaranteed by the Rock Island parent corporation in the principal sum of $453,600. Under the plan, the holders of these bonds will receive 50.2% of their claim in prior preferred $100 par value 5% stock of the face value of $686,500, and 16.7% in new second preferred $5 dividend no par value stock, to be taken at a value of $100 a share, totalling $228,000, and in addition they are to receive the $453,600 in notes above referred to.
It is earnestly urged by these objectors that the treatment accorded the Little Rock, Hot Springs and Western bonds under the plan is grossly inadequate and does not give due recognition to the value of the security behind these bonds. In its report, the Commission finds that the operation of the portion of the Little Rock Line which is owned by the Missouri Pacific has consistently resulted in deficits in earnings. Various formulae for segregation of earnings were presented and considered by the Commission in an attempt to determine the operating results of this Line. These formulae showed substantial operating losses for the Little Rock. On the other hand, the branch line formula used by the Missouri Pacific in attempting to estimate the net income contributed to the System upon business derived from branch lines indicated that substantial net revenues were so contributed to the Missouri Pacific by this short line. Objectors urge that for *446 this reason the Little Rock is of a substantial value to the System and should be treated accordingly. Testimony was offered to the effect that the scrap value of the Little Rock was approximately $200,000 and objectors contend that the value of the securities proposed to be given them under the plan is less than this value. This they attempt to establish by referring to current market prices of certain outstanding Missouri Pacific securities which they claim fairly indicates that the securities allocated to the Little Rock under the plan are worthless. We believe the conclusions thus reached are not sound for a number of reasons. In the first place, debtors have been in the process of reorganization for eight years, which fact alone would necessarily result in a serious depression in the market value of its securities. Again, investors do not know whether the proposed plan or any other plan will be approved and confirmed, or if so, when such a result may be accomplished. The unknown and indefinite factors present here make it quite impossible at the present time to make any fair appraisal of the market value of securities which are not now in existence and which may never be issued.
If the Little Rock bondholders sincerely believe that the treatment accorded them under the plan is not fair and equitable, they are not compelled to accept the securities offered them. The plan provides that where any class of creditors reject the treatment accorded them, that "the Plan may be executed by the sale or sales, at not less than value upset prices to be fixed by the Court, of all or any part of the property of the debtors, all on such conditions and in such manner as the Court may direct." In this connection, objectors contend that nothing in Section 77 authorizes the splitting up and selling separately of the security for any issues of bonds. They further contend that if Section 77 expressly undertook to provide for such a separate sale, it would be unconstitutional for the reason it would deprive said bondholders of their right to specific property without compensation.
Subsection b(1) of Section 77, provides that a plan "shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise * * *."
Subsection b(5) provides for "the sale of all or any part of the property of the debtor either subject to or free from any lien at not less than a fair upset price."
The well-established rule in equity proceedings is that property need not be sold as a whole. See Metropolitan Trust Co. v. Chicago & Eastern Illinois Railroad Company, 7 Cir., 253 F. 868.
In the opinion of the Court, under the facts disclosed by the record, the treatment received by these securities under the plan was fair and equitable and the sale provision of the plan is clearly authorized by the Act.
The Court will next consider the objections offered to the treatment accorded International-Great Northern securities. Objections were filed by the trustee under said Railroad Company's first mortgage, by the trustee under its adjustment mortgage, by the First Mortgage Bondholders' Protective Committee, by Cornelius Kroll, et al., and by the Corn Products Refining Company, holders of certain of said first mortgage bonds. The International First Mortgage issue secures Bonds in the principal sum of $28,750,000 and with interest, their claim amounts to approximately $39,000,000. The adjustment mortgage secures an issue of bonds outstanding in the principal amount of $13,807,700. With interest added, their claim amounts to slightly in excess of $21,000,000. Under the plan, first mortgage bondholders are given 29.5% of their claim in Series A general mortgage cumulative income bonds, of the par value of $11,471,000, 18.6% in Series B general mortgage convertible income bonds in the principal amount of $7,217,000, 11.% in prior preferred $100 par value 5% stock in the principal amount of $4,256,000, 14.9% of second preferred stock at a value of $4,779,000, and 26.% in no par value common stock to be taken at $100 a share, or $10,089,500. The adjustment bonds, a junior issue, receive 71,570 shares of no par value common stock under the plan.
Four principal objections are urged by one or more of said International interests. In the first place, it is urged that the claim of International first mortgage bondholders cannot be satisfied by giving them second mortgage bonds of a reorganized consolidated company while creditors of two other companies which are joined in the consolidation receive first mortgage bonds of the new company, secured in part by the International properties.
In the first place, it should be clear that if the International is to be included as a part of the reorganized company, the treatment of its security holders must be considered in relation to the whole *447 capital structure of the new company and also in relation to the treatment of all other issues. Since the plan is primarily based on a consolidation of the three principal units involved in these proceedings, there seems to be no more basis for the contention of this interest that it must be given a first mortgage position than there would be in the case where one company has two mortgages, each secured by a separate and distinct part of its railroad line. In the recent case of Consolidated Rock Products Company v. Du Bois, reported at page 675, 687, in Vol. 61 of the Supreme Court Reporter, 85 L.Ed. ___, Mr. Justice Douglas says:
"The Circuit Court of Appeals, however, made certain statements which if taken literally do not comport with the requirements of the absolute priority rule. It apparently ruled that a class of claimants with a lien on specific properties must receive full compensation out of those properties, and that a plan of reorganization is per se unfair and inequitable if it substitutes for several old bond issues, separately secured, new securities constituting an interest in all of the properties. That does not follow from Case v. Los Angeles Lumber Products Co., supra [308 U.S. 106, 60 S.Ct. 1, 84 L. Ed. 110]. If the creditors are adequately compensated for the loss of their prior claims, it is not material out of what assets they are paid. So long as they receive full compensatory treatment and so long as each group shares in the securities of the whole enterprise on an equitable basis, the requirements of `fair and equitable' are satisfied."
In discussing their failure to permit the International to participate in the fixed interest debt of the new consolidated company, the Commission stated: "Were the International applying for separate reorganization, it would be impossible, upon the present record, to justify the issuance of fixed interest obligations upon reorganization of that company. It follows that a participation by the International in the fixed interest debt of the new consolidated company should not be authorized at the expense of the other two principal debtors whose contributions to the system earnings do justify such participation."
The aforesaid objection of the International interests is accordingly overruled.
It is further urged that there is a technical defect in the plan for the reason that the Commission did not give adequate reasons for its treatment of the International first mortgage bonds. Without attempting to detail the reasons assigned in the Commission's report, the Court is of the opinion that a careful reading of the report discloses that ample reasons are given for the findings of the Commission.
It is next urged that the treatment given the International interests under the plan is neither equitable, fair nor adequate. In support of this contention, it is pointed out that the treatment accorded International bondholders under certain plans filed with the Commission in 1936 and 1937 made substantially better provision for this interest than does the Commission's plan now under consideration. It is further urged that too little consideration has been given to the favorable earning record of the International prior to 1936, and too great weight has been given to the fact that for the period 1936 to 1939, inclusive, it failed to earn anything toward its fixed charges. These objections were carefully considered by the Commission and are fully covered by its report. Among other things, the report pointed out that "undoubtedly the opening up of the East Texas oil field contributed heavily to the International's volume of traffic in 1931 and in the years immediately following."
It further calls attention to the fact that most of this traffic has been lost.
It is further urged that paragraph (W) of the plan (printed rec. p. 12330) should not be approved by the Court. This objection is particularly urged by the trustee under the adjustment mortgage which otherwise approves the treatment that is accorded the interest which it represents. Said paragraph (W) provides that if International security holders reject the plan, then the International properties need not be included in the consolidation. It is urged that the Commission has found that it is compatible with the public interest to consolidate the properties of debtor companies, including those of the International-Great Northern, and that therefore, it is inconsistent for the plan to provide for the exclusion of the International from the consolidation. In the first place, the contingency under which the plan provides that the International may be excluded may not occur, and in the second place, finding that it is compatible with the public interest to include the International in the consolidation is not the equivalent of finding that such inclusion is required by the public interest. There is no such finding by the Commission and it would not seem fair to *448 the other important interests involved in this proceeding to deny them reorganization because one interest was dissatisfied with the treatment accorded it.
There is another problem that must be considered in connection with the inclusion of the International properties in the new reorganized company. The Commission has found that the properties of the debtors (other than Missouri-Illinois Railway Company) shall be merged or consolidated into a reorganized company. Rec. p. 12276. The record shows and the Commission has found that certain economies may reasonably be expected to be effected thereby, and that better service will probably result from system operation rather than from separate operation, and that such a consolidation will permit a simplified capital structure. Rec. p. 12136. According to the Commission's finding the record is persuasive that the proposed consolidation will result in benefit to the public, to the creditors of the debtors and to such of their stockholders as may have an interest in the new company. Rec. p. 12139. The Commission has further found that the consolidation of all of these debtors is consistent with the provisions and purposes of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. Rec. p. 12218.
This court concurs in these findings, and is of the opinion that the proposed consolidations should be consummated in so far as legally and practically feasible.
Subdivision f of the Act provides that upon the confirmation of the Plan the "debtor and any other corporation or corporations organized or to be organized for the purpose of carrying out the plan, shall have full power and authority to, and shall put into effect and carry out the plan and the orders of the judge relative thereto, under and subject to the supervision and the control of the judge, the laws of any State or the decision or order of any State authority to the contrary notwithstanding."
The general offices of the Missouri Pacific have long been maintained at St. Louis, and in the event of consolidation of all or part of the Texas lines with the remainder of the System lines, it will not be feasible to move the general offices from St. Louis.
The Court is therefore of the opinion that notwithstanding certain statutes of the State of Texas, Vernon's Ann.Civ.St. Tex. art. 6260 et seq., providing that no railroad corporation except one chartered under the laws of the State of Texas shall be authorized to operate in that State, and requiring the maintenance of general offices there, this Court in the carrying out of the plan, is vested with authority to direct the acquisition and operation of the properties of the so-called Gulf Coast Lines by a corporation to be organized under the laws of such foreign State as the Court may approve, and with principal offices and officers situated in the City of St. Louis. Inconsistent State laws must give way to consolidations effected under authority of the commerce or bankruptcy powers of the federal constitution. Texas v. United States, 292 U.S. 522, 54 S.Ct. 819, 78 L.Ed. 1402.
A different question is presented with respect to properties of the International-Great Northern by reason of the specific provision of subdivision n of Section 77, which provides: "No reorganization effected under this Act [title] and no order of the court or Commission in connection therewith shall relieve any carrier from the obligation of any final judgment of any Federal or State court rendered prior to January 1, 1929, against such carrier or against one of its predecessors in title, requiring the maintenance of offices, shops, and roundhouses at any place, where such judgment was rendered on account of the making of a valid contract or contracts by such carrier or one of its predecessors in title."
This provision was obviously intended to require the maintenance at Palestine of the shops and offices of any successor in interest to the International-Great Northern Railroad Company. International & G. N. R. Co. v. Anderson County, Tex.Civ.App., 174 S.W. 305, and Id., 246 U.S. 424, 38 S.Ct. 370, 62 L.Ed. 807.
In the absence of some modification of the decree of the State Court in the Anderson County case, it seems imperative that either the general offices of the consolidated company must be moved to Palestine, or else the International-Great Northern must continue to be operated separately until such time as a consolidation may be authorized under Section 5 of the Interstate Commerce Act, 49 U.S.C.A. § 5.
The order of the Commission provides that the Court may cure any defect, supply any omission, or reconcile any inconsistency in such manner or to such extent as may be necessary or expedient to carry out the plan effectively. Rec. p. 12331. *449 Notwithstanding language elsewhere in the plan respecting the consolidation into one reorganized company, the Court finds that it has authority to continue the corporate organization of the present International-Great Northern, or to provide for its assets to be taken over by a separate company, as may hereafter be recommended by the reorganization managers. The plan is accordingly "cured" in this respect, but without prejudice to the provisions of subdivision (W). Rec. p. 12330. Whatever company takes over the International's properties will of course take over the properties of its subsidiary, Austin Dam and Suburban Railway Company.
In the provisions of the plan relating to the lien of the new first mortgage, it is provided that such lien may take the form of the pledge or assignment of securities of a corporation or corporations owning, or securities having a lien upon property to which the lien is intended to extend. Rec. p. 12285. This provision implies that with respect to the Palestine situation it may be necessary to resort to the medium of a subsidiary.
Commissioner Splawn in his concurring opinion expresses the understanding that Palestine wishes only to be assured that the International's facilities, which it now has, be not diminished or abandoned. Should the reorganization managers secure such a modification of the decree in the Anderson County case, then it is the opinion of the Court that the plan should be literally carried out through the medium of a single consolidated company.
After carefully considering all of the objections urged by the various International interests, the Court is of the opinion that the plan is fair and reasonable in its treatment of the International security holders and said objections are accordingly overruled.
The Railroad Credit Corporation requests that the plan be modified so as not to require it to surrender the distributive shares which it now currently applies as credits to the indebtedness of debtor companies. Under the plan, its claim is given one hundred per cent (100%) treatment by the allotment to it of Series A-3¾% first mortgage bonds equal to the principal amount of its claim. Its request for modification is predicated upon its fear that the bonds which it is to receive may not be saleable at par. It bases its reason for fearing that the bonds may not sell for par on the same argument that was offered by the Little Rock, Hot Springs & Western interest. For the reasons heretofore presented, the Court does not believe there is any present standard by which the value of these new securities may be determined. There seems to be no doubt but that the reorganized company will readily earn the interest upon these Series A first mortgage bonds. If this were not true, the basis upon which the plan is built would be unsound. It should also be noted that the indebtedness to the Railroad Credit Corporation now bears interest at the nominal rate of one per cent (1%) per annum, whereas the bonds which it is to receive will bear interest at the rate of three and three-quarters per cent (3¾%) per annum. In the Court's opinion, this claim has received fair and equitable treatment and this creditor should be able to realize one hundred per cent (100%) upon its claim.
There are other objections to the plan which primarily deal with the question of distribution of the securities of the reorganized company. Most of these objections come from junior interests which earnestly urge that they are entitled to a larger share of the new securities, or that compared with some other interest, the treatment of their claim is not as favorable as it should be. The Court has given careful consideration to all of these objections and has reached the conclusion that the plan is fair and equitable in its treatment of these claims and said objections will be accordingly overruled.
There are still pending and undisposed of the applications of various parties in interest for allowances of fees and expenses incident to the reorganization and the plan. As heretofore noted, these petitions were certified to the Interstate Commerce Commission which, after extensive hearings, has fixed the maximums within which allowances may be made. The report and order of the Commission, together with a transcript of the record before the Commission, has been duly filed in these proceedings. Allowances will accordingly be made upon said applications within the maximum limits fixed by the Commission.
The Court finds that a further defect in the plan should be cured:
The name of the Velasco Wharf and Warehouse Company should be eliminated from paragraph (B) of the plan for the reason *450 that said company has been liquidated and dissolved.
By its order No. 1763-A, duly entered on April 11, 1941, this Court reclassified the creditors and stockholders of the various debtors into twenty-four classes according to the nature of their respective claims and interest. The Court finds that the following classes of creditors who under the provisions of the plan are found to have an equitable interest in the debtor estates, are affected by the plan and should be permitted to vote thereon, to-wit: Classes three (3), four (4), ten (10), eleven (11), twelve (12), thirteen (13), fourteen (14), fifteen (15), sixteen (16), seventeen (17), eighteen (18), nineteen (19), twenty (20), twenty-one (21), twenty-two (22) and twenty-three (23).
In conclusion, the Court is satisfied that the Plan duly certified to it by the Commission fully complies with the requirements of subsection e of Section 77 of the Bankruptcy Act, and that said plan should be approved.
Counsel will promptly prepare and upon not less than ten (10) days' written notice to be given by the trustee to all parties in interest to these proceedings as set forth in "Schedule A" annexed to order No. 1494 (Rec. p. 11837), shall present proposed findings of fact and conclusions of law and a decree or decrees consistent with the views herein expressed.