# NO. 12-23-00152-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *UNION PACIFIC RAILROAD COMPANY,*<br>*APPELLANT* | § | *APPEAL FROM THE 369TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *ANDERSON COUNTY, ET AL,*<br>*APPELLEES* | § | *CHEROKEE COUNTY, TEXAS* |

## *OPINION*

Union Pacific Railroad Company appeals the trial court's granting of summary judgment in favor of Anderson County and the City of Palestine and denying its motion for summary judgment and motion to dismiss. Union Pacific presents five issues on appeal. We reverse and render.

## BACKGROUND

The background of this case spans 150 years, and much of it is not in dispute. It has been discussed at length in prior federal court opinions; however, we recount it here to illuminate the intersection between the parties' purported contractual agreements and increased federal regulation of the railroad system.

### The 1872 Original Agreement

In the 1870s, during the boom of westward railroad expansion following the Civil War, small towns competed for railroad depots and stops as essential parts of their continued economic power and survival. One of these towns was Palestine, Texas. Palestine was uniquely positioned to serve as the crossroads between the International Railroad, approaching Palestine

from Hearne, Texas to the southwest, and the Houston and Great Northern Railroad Company ("HGNR"), approaching Palestine from Houston to the south. *See **City of Palestine v. United States***, 559 F.2d 408, 410 (5th Cir. 1977). In 1872, under the leadership of John H. Reagan, Palestine and Anderson County raised $150,000 in bonds from their citizens to finance the railroad. ***Id.*** In turn, HGNR agreed to "run[ ] cars regularly" to Palestine, construct a depot, and "locate and establish and forever thereafter keep and maintain" its "general offices, machine shops and roundhouses" in Palestine. ***Id.***

In 1873, HGNR merged with the International Railroad to create the International & Great Northern Railroad (IGNR). ***Id.*** The Texas legislature approved the merger so long as IGNR assumed "all acts done in the name of either of the companies," including HGNR's obligations in the 1872 Agreement with Palestine. ***Id.*** Consideration included another $150,000 in bonds and Palestine's commitment to construct housing for the IGNR employees. ***Id.***

**1892 and 1911 Foreclosure Sales and 1914 Judgment Granting Injunctive Relief**

In 1892, IGNR's assets were sold at a foreclosure sale, but because the purchasers were trustees for IGNR's stockholders, Texas courts ultimately classified this as a mortgage refinancing rather than a bona fide sale. ***Int'l & Great N. Ry. Co. v. Anderson Cty. (IGNR IV)***, 246 U.S. 424, 433, 38 S. Ct. 370, 373, 62 L. Ed. 807 (1918). Thus, the 1872 Agreement remained in effect. ***Int'l & Great N. Ry. Co. v. Anderson Cty. (IGNR III)***, 174 S.W. 305, 316 (Tex. Civ. App–Texarkana 1915), *aff'd*, 246 U.S. 424, 38 S. Ct. 370, 62 L. Ed. 807 (1918).

In 1911, IGNR again sold its assets at a foreclosure sale, this time to outside investors who kept the name of the company and listed Houston as the new corporate office. ***City of Palestine***, 559 F.2d at 410-11. However, because IGNR planned to move its offices, Palestine and Anderson County successfully sued for an injunction under the 1872 Agreement to keep IGNR's "general offices, machine shops, and roundhouses in Palestine "forever." ***IGNR III***, 174 S.W. at 327. This 1914 Judgment was twice upheld by both the Texas Court of Civil Appeals and the United States Supreme Court. *See id.; see also, **IGNR IV***, 246 U.S. at 434, 38 S. Ct. 370.

In addressing the impact of the foreclosure, Texas courts concluded that there was no "irregularity in the foreclosure proceedings or in the organization of the new company" that would impute the personal obligations of the prior company onto the purchaser. ***Int'l & Great N. Ry. Co. v. Anderson Cty. (IGNR I)***, 150 S.W. 239, 250 (Tex. Civ. App–Galveston 1912),

2

*aff'd*, **Int'l & Great N. Ry. Co. v. Anderson Cty. (IGNR II)**, 156 S.W. 499 (Tex. 1913). Instead, the courts used the general rule that "the purchaser of a railroad sold under" foreclosure would take ownership "free from all liability" for indebtedness and similar personal obligations. **IGNR I**, 150 S.W. at 250. The obligation to "maintain its offices, shops and roundhouses in Palestine" was a "personal obligation that would not have bound the new company." **City of Palestine**, 559 F.2d at 411; *see also* **IGNR I**, 150 S.W. at 250 (noting that the purchaser in a railroad foreclosure obtains property "free from all mere personal obligations of the former company," including a contract "for the establishment and permanent maintenance of a depot").

Even though personal contractual obligations typically do not transfer to the purchaser in a foreclosure sale, Texas state courts nonetheless concluded that the Texas Office Shops Act changed this calculus, and the purchaser was thus "liable to perform the public duties imposed by law upon the old corporation." **IGNR II**, 156 S.W. at 503 (internal quotations omitted). The Office Shops Act required a railroad such as IGNR to "keep and maintain its general offices at such place within this state where it shall have contracted or agreed" and "said location shall not be changed" even during consolidation if the railroad was "aided . . . by an issue of bonds in consideration of such location." **City of Palestine**, 559 F.2d at 411 (quoting TEX. REV. CIV. STAT. art. 6423 (1911)).

In short, the Texas courts held that the 1889 Office Shops Act mandated the transfer of IGNR's personal obligation to remain in Palestine to the new purchaser. **IGNR I**, 150 S.W. at 251 (noting that the requirement was not "a mere personal obligation of that company, but was an obligation or duty imposed by law" that could not be disavowed in a foreclosure sale, even to a bona fide purchaser). The Texas Court of Civil Appeals stated that the 1914 Judgment was "entirely dependent upon the statute, and not the enforcement of a private contract as such, for its vitality." **IGNR III**, 174 S.W. at 316.

IGNR appealed to the United States Supreme Court, arguing that the Office Shops Act impermissibly burdened interstate commerce and contractual obligations. **IGNR IV**, 246 U.S. at 428, 38 S. Ct. 370. The Supreme Court disagreed and noted that the new IGNR "took out a charter under general laws that expressly subjected it to the limitations imposed by law." *Id.* at 432, 38 S. Ct. 370.

**1954 Agreement and 1955 Judgment Modifying 1914 Judgment**

Later, in the 1920s, Missouri Pacific (MoPac) purchased IGNR. **City of Palestine**, 559

F.2d at 412. In the 1930s, MoPac filed for bankruptcy and requested reorganization under the Bankruptcy Act. *Id.* As part of its proposed reorganization, MoPac stated it would consolidate with its subsidiaries, including IGNR. *Id.* But because the 1914 Judgment required IGNR to maintain its general offices in Palestine, and MoPac's offices were located elsewhere, this posed a serious problem. *Id.*

The Bankruptcy Act also included the following requirement, which, in essence, required continued enforcement of the 1914 Judgment:

> *No reorganization effected* under this title and no order of the court or Commission in connection therewith *shall relieve any carrier from the obligation of any final judgment of any Federal or State court rendered prior to January 1, 1929*, against such carrier or against one of its predecessors in title, *requiring the maintenance of offices, shops, and roundhouses at any place, where such judgment was rendered* on account of the making of a valid contract or contracts by such carrier or one of its predecessors in title.

*Id.* (citing 11 U.S.C. § 205(n) (1970) (emphasis added)).

Given these difficulties, the bankruptcy court requested that MoPac negotiate with Palestine and Anderson County to modify the 1914 Judgment before it would approve the reorganization. *Id.* As a result of these negotiations, MoPac "agreed to forever maintain in Palestine 4.5% of all of its employees in certain job classifications," but it did not have to "maintain its general offices, shops and roundhouses in Palestine." *Id.* (the 1954 Agreement). MoPac agreed that as long as it or "any successor in interest or assign thereof shall remain in the railroad business," it would maintain "Office and Shop Employees" in Palestine. A group of ten local citizens (the Palestine Citizens Committee) signed the 1954 Agreement along with MoPac, Palestine, and Anderson County.

In 1955, the District Court of Cherokee County, Texas, entered a judgment (the 1955 Judgment) that modified the 1914 Judgment to align with the 1954 Agreement's terms, and the bankruptcy court approved the proposed reorganization. *Id.*

**Union Pacific Acquires MoPac, Assumes Operations in Palestine; Texas Repeals Office Shops Act**

Approximately three decades passed, and in 1982, Union Pacific first acquired MoPac, and they subsequently merged. In 1995, Congress passed the Interstate Commerce Commission Termination Act (ICCTA) which established the Surface Transportation Board (STB) to regulate rail carriers and preempted various state and local laws that were within the STB's jurisdiction. 49 U.S.C. § 10501(b). In 2007, Texas repealed its Office Shops Act after determining the ICCTA

4

preempted it. *See* H.R. Rep. 80-3711, Reg. Sess. at 1 (Tex. 2007).

With automatic adjustments from subsequent mergers, Union Pacific must maintain 0.52% of its "Office and Shop" employees in Palestine. Under the 1954 Agreement, these employees can be "Executives, Officials and Staff Assistants; Professional, Clerical, and General; Maintenance of Equipment and Stores; Transportation (other than Train, Engine and Yard); Transportation (Yardmasters, Switch Tenders, and Hostlers)." These employees fall into two categories: (1) "the freight claims department, which investigates and resolves claims arising out of shipments on Union Pacific's rail line," and (2) "the car shop, which repairs cars in Union Pacific's fleet."

## Procedural History

In November 2019, Union Pacific filed suit in federal court seeking declaratory relief that the ICCTA preempts the 1954 Agreement. Union Pacific also sought an injunction preventing Palestine and Anderson County from enforcing the Agreement. *See Union Pacific Railroad Co. v. City of Palestine*, 517 F. Supp. 3d 609, 618 (E.D. Tex. 2021).

Palestine and Anderson County filed a motion to dismiss and a motion for judgment on the pleadings. *Id.* The motions were based on the Anti-Injunction Act and the failure to join the Palestine Citizens Committee—the ten local citizens who signed the 1954 Agreement. *Id.* The district court denied these motions. *Id.*

Union Pacific filed a motion for summary judgment, which the district court granted, holding that the 1954 Agreement was expressly and impliedly preempted. *Id.* at 625-31. It also concluded that the 1954 Agreement did not meet the voluntary contract exception to preemption. *Id.* at 631-33. The district court enjoined Palestine and Anderson County from enforcing the 1954 Agreement against Union Pacific.

Defendants appealed the district court's grant of summary judgment for Union Pacific and the denials of their motion to dismiss for failure to join a necessary party, motion for judgment on the pleadings, and cross-motion for summary judgment to the Fifth Circuit. *See Union Pacific Railroad Co. v. City of Palestine*, 41 F.4th 696, 703 (5th Cir. 2022). The Fifth Circuit likewise determined the 1954 Agreement was preempted by the ICCTA and held that Union Pacific is "free to leave" Palestine. *Id.* at 700.

After the district court entered judgment, and while the case was on appeal to the Fifth Circuit, Palestine and Anderson County filed suit in Texas state court seeking to enforce the

1955 Judgment which had approved the 1954 Agreement. Union Pacific filed a cross-petition and motion to vacate the 1955 Judgment. On July 15, 2021, the trial court granted the City's and County's request for temporary relief and ordered Union Pacific to continue to comply with "the reporting and employment requirements imposed by the 1955 Judgment and its terms until further orders of this Court." The parties filed cross-motions for summary judgment regarding the continuing validity of the 1955 Judgment. Union Pacific argued that collateral estoppel and preemption barred enforcement of the 1955 Judgment. While Palestine and Anderson County contended collateral estoppel and preemption did not apply, Union Pacific failed to plead a sufficient change in circumstances to warrant dissolving the 1955 Judgment, and Union Pacific's claim was barred by laches. After the Fifth Circuit ruled, Union Pacific filed motions to dissolve or modify the trial court's July 2021 injunction. Palestine and Anderson County responded and filed a plea to the jurisdiction, arguing that the trial court lacked jurisdiction to modify or dissolve the 1955 Judgment. Meanwhile, a group purporting to be the "Citizens Committee" filed a notice of intervention, which Union Pacific moved to strike.

Ultimately, the trial court granted Palestine's and Anderson County's motion for summary judgment, granted the plea to the jurisdiction, denied Union Pacific's motion for summary judgment, and denied the motions to vacate the 1955 Judgment and the July 2021 injunction. The court also denied Union Pacific's motion to strike the notice of intervention. This appeal followed.

## JURISDICTION

As a preliminary matter, we address Palestine's and Anderson County's motion to dismiss. In their motion, they assert this Court lacks jurisdiction because there is no appealable order. They further urge that we lack jurisdiction because the original judgment is not an injunction.

### Final Appealable Order

A judgment issued without a conventional trial is final for purposes of appeal if, and only if, it actually disposes of all claims and parties then before the court, regardless of its language, or it states with unmistakable clarity that it is a final judgment as to all claims and all parties. *See Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 205 (Tex. 2001); *In re Certain Underwriters at Lloyd's London,* No. 01–09–00851–CV, 2010 WL 184300, at *2 (Tex. App–Houston [1st

Dist.] 2010, orig. proceeding) (mem. op.). If a judgment disposes of all parties and claims, based on the record in the case, it is a final judgment, regardless of its language. *See Lehmann*, 39 S.W.3d at 200. Even if an order or judgment does not finally dispose of all remaining parties and claims, express language of finality can make it final, even though it should have been interlocutory. *Id.* But an order does not dispose of all claims and all parties merely because it is entitled "final," or because the word "final" appears elsewhere in the order, or even because it awards costs. *Id.* at 205.

Here, the trial court entered four written orders on May 15, 2023. By those orders, the trial court denied Union Pacific's motion for summary judgment, denied Union Pacific's motion to vacate and granted Palestine's and Anderson County's plea to the jurisdiction, denied Union Pacific's plea to the jurisdiction and motion to strike the intervention, and granted Anderson County's and Palestine's motion for summary judgment. These orders disposed of all pending claims by the parties. In their motion to dismiss, Palestine and Anderson County neglect the ruling on their motion for summary judgment and argue that the other three orders do not dispose of all claims. However, because the trial court also granted Palestine's and Anderson County's motion for summary judgment, all pending claims have been disposed and there is a final, appealable order. *See id.* at 205. We overrule the motion to dismiss.

## Injunction

Palestine and Anderson County further urge this Court lacks jurisdiction because the 1955 Judgment is not an injunction. As a result, they contend the trial court's plenary power expired and this Court lacks jurisdiction to vacate the judgment. In its third issue, Union Pacific urges that the trial court maintained continuing jurisdiction to dissolve the injunction. We agree with Union Pacific.

A court granting a permanent injunction may retain jurisdiction to change, alter or modify it depending upon the facts and circumstances subsequently shown to change the reason for the granting of equitable relief. *Fuller v. Walter E. Heller & Co.*, 483 S.W.2d 348, 351 (Tex. App.—Dallas 1972, no writ). This is an exception to the general rule that the trial court's plenary power expires thirty days after the signing of a judgment. *See* TEX. R. CIV. P. 329b(d).

At its core, an injunction is a court order commanding or preventing an action. BLACK'S LAW DICTIONARY (11th ed. 2019). The 1955 Judgment commands Union Pacific to remain in Palestine perpetually. It concerns a continuing situation that carries the continuing right of the

trial court to change, alter, or modify the decree upon a showing of changed conditions or circumstances. *See Fuller*, 483 S.W.2d at 351 (distinguishing *City of Tyler v. St. Louis Sw. Ry. Co. of Tex.*, 405 S.W.2d 330 (Tex. 1966)). Therefore, the 1955 Judgment is an injunction.

Furthermore, Palestine and Anderson County sought and obtained an injunction against Union Pacific forcing it to comply with the requirements of the 1955 Judgment. Therefore, the trial court and this Court have continuing jurisdiction to vacate such an injunction. *See City of Tyler*, 405 S.W.2d at 333. We sustain Union Pacific's third issue.

## SUMMARY JUDGMENT

We review traditional motions for summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail, the movant must show there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215-16 (Tex. 2003). If the movant satisfies this burden, the burden shifts to the nonmovant to provide evidence that raises a genuine issue of material fact, thus avoiding summary judgment. *See Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014). When, as here, cross-motions for summary judgment are filed, we consider each motion and render the judgment the trial court should have reached. *Coastal Liquids Transp., LP v. Harris Cty. Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex. 2001). When, also as here, "a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious." *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989).

## Collateral Estoppel

In its first issue, Union Pacific urges the case has previously been litigated in the federal courts and is thereby barred by collateral estoppel. As a result, it urges the trial court should have granted its motion for summary judgment and motion to vacate the 1955 judgment.

### *Applicable Law*

The doctrine of collateral estoppel precludes relitigation of ultimate issues of fact actually litigated and essential to the judgment in a prior suit. *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 801 (Tex. 1992); *Tarter v. Metro. Sav. & Loan Ass'n*, 744 S.W.2d 926, 927 (Tex. 1988). "The term 'ultimate issue' does not refer to a cause of action or a claim." *Tarter*, 744

8

S.W.2d at 928; *see also* **Haddock v. Gruber**, No. 05-16-01113-CV, 2018 WL 1417453, at *8 (Tex. App.—Dallas Mar. 22, 2018, pet. denied) (mem. op.). Collateral estoppel applies when the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior suit and lost. *See* **Quinney Elec., Inc. v. Kondos Entm't, Inc.**, 988 S.W.2d 212, 213 (Tex. 1999); **Tarter**, 744 S.W.2d at 927. Collateral estoppel is designed to promote judicial efficiency, protect parties from multiple lawsuits, and prevent inconsistent judgments by precluding relitigation of issues. **Sysco Food Servs., Inc. v. Trapnell**, 890 S.W.2d 796, 802 (Tex. 1994).

Collateral estoppel can be applied offensively or defensively. **Mann v. Old Republic Nat'l Title Ins. Co.**, 975 S.W.2d 347, 351 n.5 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Offensive collateral estoppel is used by a plaintiff "seeking to estop a defendant from relitigating an issue which the defendant previously litigated and lost in a suit involving another party." **Fletcher v. Nat'l Bank of Commerce**, 825 S.W.2d 176, 177 (Tex. App.—Amarillo 1992, no writ). Defensive use of collateral estoppel is the opposite—that is, the defendant asserts collateral estoppel as an affirmative defense because the plaintiff previously litigated the issue and lost. *Id.* Union Pacific employs the doctrine defensively.

To invoke collateral estoppel successfully, a party must establish the following elements: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action. **Eagle Props., Ltd. v. Scharbauer**, 807 S.W.2d 714, 721 (Tex. 1990); **Mann**, 975 S.W.2d at 350. Whether collateral estoppel applies is a question of law for the court to decide. **Spera v. Fleming, Hovenkamp & Grayson, P.C.**, 25 S.W.3d 863, 870 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

To determine whether the facts were fully and fairly litigated in the first suit, we consider "(1) whether the parties were fully heard, (2) that the court supported its decision with a reasoned opinion, and (3) that the decision was subject to appeal or was in fact reviewed on appeal." **Mower v. Boyer**, 811 S.W.2d 560, 562 (Tex. 1991); **Cole v. G.O. Assocs., Ltd.**, 847 S.W.2d 429, 431 (Tex. App.–Fort Worth 1993, writ denied). To determine whether a fact issue is essential to the judgment, i.e., whether it is an "ultimate issue," we look to the factual determinations made by the trier of fact that are "necessary to form the basis of a judgment." **Tarter**, 744 S.W.2d at 928.

9

For parties to be cast as adversaries in the first suit, "it is only necessary that the party *against whom* the doctrine is asserted was a party or in privity with a party in the first action." *Trapnell*, 890 S.W.2d at 801–02; *see Eagle Props.*, 807 S.W.2d at 721; *Tex. Capital Secs. Mgmt., Inc. v. Sandefer*, 80 S.W.3d 260, 264 (Tex. App.–Texarkana 2002, pet. struck). Whether collateral estoppel applies depends on the circumstances of the particular case. *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 890 (Tex. 1998); *Sandefer*, 80 S.W.3d at 265. However, parties are generally in privity when "(1) they control an action even if they are not parties to it; (2) their interests are represented by a party to the action; or (3) they are successors in interest, deriving their claims through a party to the prior action." *Neel*, 982 S.W.2d at 890 (citing *Benson v. Wanda Petroleum*, 468 S.W.2d 361, 362 (Tex. 1971)); *Sandefer*, 80 S.W.3d at 265. "Privity connotes those who are in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right." *Sandefer*, 80 S.W.3d at 265 (citing *Benson*, 468 S.W.2d at 363). The determination of whether parties are in privity is the same for both res judicata and collateral estoppel. *See Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 653 (Tex. 1996); *Benson*, 468 S.W.2d at 363–64.

_Analysis_

Union Pacific contends that the federal courts have already determined its obligation is preempted and, as a result, the enforceability of the 1955 Judgment is barred by collateral estoppel. However, Anderson County and Palestine urge that the federal action concerned the 1954 Agreement and not the 1955 Judgment. Union Pacific claims this distinction is immaterial because the preemption issue is the same whether discussing the 1954 Agreement or the 1955 Judgment.

The 1955 Judgment adopted, and is practically identical to, the 1954 Agreement. Both the Eastern District and the Fifth Circuit explained in lengthy opinions why Union Pacific's obligations under the 1954 Agreement are preempted by the ICCTA. The federal courts' preemption analysis did not hinge on whether the obligations imposed on Union Pacific were contained in a judgment or an agreement. Instead, the preemption analysis determined whether the substantive obligations imposed by state law conflict with federal law. Therefore, even if the causes of action are different in the state court action, the issues are the same. *See BP Auto. LP v. RML Waxahachie Dodge, LLC*, 517 S.W.3d 186, 200 (Tex. App.—Texarkana 2017, no pet.) (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 521 (Tex.

1998)).

Palestine and Anderson County claim that the Eastern District judgment states that it does not affect the 1955 Judgment. However, that judgment merely clarified that the federal district court was not asked to enjoin the parties from filing any action in state court regarding the 1955 Judgment. This has more to do with the independent roles of federal and state courts than the enforceability of the 1955 Judgment. Federal courts do not usually enjoin state courts from enforcing their judgments. Therefore, the federal court left all issues regarding the 1955 Judgment, including collateral estoppel, for the state court's determination.

The issue before the federal courts was whether the ICCTA preempts Union Pacific's obligations under the 1954 Agreement. The parties were able to brief the preemption issue on summary judgment before the federal district court. After hearing oral argument and reviewing the briefing, the district court issued an extensive opinion detailing its analysis as to why the 1954 Agreement is preempted. *See generally, Union Pacific RR Co. v. City of Palestine*, 517 F. Supp. 3d 609 (E.D. Tex. 2021). Then, the district court's decision was appealed to the Fifth Circuit, which likewise issued an opinion that the ICCTA preempts the 1954 Agreement. *See generally, Union Pacific RR Co. v. City of Palestine, Tex.*, 41 F.4th 696 (5th Cir. 2022). Therefore, the issue was fully litigated in the prior suit. *See Mower*, 811 S.W.2d at 562. This preemption analysis was the basis for the District Court's and Fifth Circuit's findings that the obligations are unenforceable and Union Pacific may leave Palestine; therefore, the facts were essential to the federal court judgments. *See Tarter*, 744 S.W.2d at 928. In addition, Union Pacific, Palestine, Anderson County, and the Citizens Committee were all parties to the federal case. Therefore, they were adversaries in both actions. *See BP Auto*, 517 S.W.3d at 199.

Based on the foregoing, we hold that collateral estoppel applies to this case. Because the federal courts determined that Union Pacific's obligations are preempted by the ICCTA, the trial court should have granted Union Pacific's motion for summary judgment and motion to vacate the 1955 judgment based on collateral estoppel. We sustain Union Pacific's first issue.

**Preemption**

In its second issue, Union Pacific contends that, if the issue is not precluded by collateral estoppel, the trial court should have found that the obligations under the 1955 Judgment are preempted by the ICCTA. Essentially, it urges that the trial court should have concurred with the federal courts. We agree and adopt the reasoning of the Eastern District and Fifth Circuit.

11

*Applicable Law*

Any state law that conflicts with either a federal law or the Constitution is "without effect." ***Maryland v. Louisiana***, 451 U.S. 725, 746, 101 S. Ct. 2114, 2128, 68 L.Ed.2d 576 (1981). This framework, known as preemption, applies in the railroad context where a state law remedy "invokes laws that have the effect of managing or governing, and not merely incidentally affecting, rail transportation." ***Franks Inv. Co. LLC v. Union Pacific R.R. Co.***, 593 F.3d 404, 411 (5th Cir. 2010) (citation omitted). In determining whether a state law or regulation is preempted, Congress's intent is the "ultimate touchstone." ***Medtronic, Inc. v. Lohr***, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250, 135 L.Ed.2d 700 (1996). Congress can indicate its preemptive intent either expressly, through a statute's plain language, or impliedly, through its "structure and purpose." ***Altria Group, Inc. v. Good***, 555 U.S. 70, 76, 129 S. Ct. 538, 543, 172 L.Ed.2d 398 (2008). In 1995, Congress enacted key legislation known as the ICCTA which abolished the Interstate Commerce Commission and established the Surface Transportation Board to have broad jurisdiction over rail operations. *See* 49 U.S.C. § 10101, *et seq.*

The ICCTA essentially overhauled the railroad industry, which was already historically intertwined with the federal government: "[R]ailroad operations [have] long been a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce, and it appears manifest that Congress intended the ICCTA to further that exclusively federal effort, at least in the economic realm." ***Friberg v. Kan. City S. Ry. Co.***, 267 F.3d 439, 443 (5th Cir. 2001). In response to the ICCTA, in 2007, the Texas legislature repealed the Office Shops Acts, concluding it was "preempted by federal law." H.R. 80-3711, Reg. Sess. at 1 (Tex. 2007).

Section 10501(b) of the ICCTA evinces the explicit preemptive intent of Congress, as it describes the STB's exclusive jurisdiction over a wide range of railroad operations:

> (b) The jurisdiction of the Board over—
>
> > (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
> >
> > (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

<u>Analysis</u>

The Fifth Circuit previously addressed preemption under the ICCTA, holding that Section 10501(b) expressly preempts laws that seek to "manag[e] or govern[ ] rail transportation" and that "[t]o the extent remedies are provided under laws *that have the effect of regulating rail transportation*, they are [expressly] preempted." ***Franks***, 593 F.3d at 410 (emphasis in original). However, if a state law or regulation only has a "mere remote or incidental effect on rail transportation," it is not expressly preempted. ***Elam v. Kan. City S. Ry. Co.***, 635 F.3d 796, 805 (5th Cir. 2011) (internal quotations omitted).

Rail "transportation" is broadly defined to include "facilit[ies]" and "services" that are "related to the movement of passengers or property, or both, by rail." 49 U.S.C. § 10102(9). The Fifth Circuit held that "because the 1954 Agreement manages and governs facilities or services related to the movement of passengers or property by rail, it is expressly preempted." ***Union Pacific***, 41 F.4th at 705.

The Fifth Circuit recognized that the 1954 Agreement requires Union Pacific to employ a certain percentage of its "Office and Shop Employees" in Palestine. ***Id.*** Union Pacific maintains a car shop and freight claims office to comply with that agreement. The car shop employees repair empty freight cars, and the freight claims office processes complaints and claims for freight damage. "Both categories include employees who are engaged in 'services related to' the 'movement [of] property' by rail." ***Id.***

Anderson County and Palestine urged that the employee requirement has no direct impact on the movement of freight because the employees work on railcars that are out of service and the shipping claims employees deal with involve items previously moved by rail. ***Id.*** The court disagreed because the ICCTA does not require contemporaneous movement of property related to the rails for the regulation to be preempted. ***Id.*** Instead, the Fifth Circuit opined that if the "facilities or services—in any non-incidental way—relate to the movement of property by rail, they are preempted by the ICCTA." ***Id.***

The rail car repair shop employees work on cars that were involved in and may later be involved in the movement of items by rail, and the freight claims office employees deal with problems that arose while property traveled by rail. ***Id.*** The 1954 Agreement was premised on now-preempted and repealed Texas law and requires the continued employ of those individuals;

therefore, the 1954 Agreement regulates Union Pacific's use of railroad facilities and services. *Id.*

The Fifth Circuit further opined that the 1954 Agreement's mandate that Union Pacific cannot leave Palestine interferes with the STB's exclusive jurisdiction over "routes, services, and facilities" and the "abandonment, or discontinuance of . . . facilities." *Id.*; 49 U.S.C. § 10501(b). As a result, the Fifth Circuit concluded that the Eastern District correctly held that the 1954 Agreement is expressly preempted.

As noted above, the 1955 Judgment mirrors and memorializes the 1954 Agreement. Applying the federal courts' reasoning, the 1955 Judgment's requirement that Union Pacific remain in Palestine both regulates Union Pacific's use of railroad facilities and services and interferes with the STB's jurisdiction over those facilities. As a result, the 1955 Judgment's perpetual obligations on Union Pacific are preempted by the ICCTA. As Justice Holmes recognized, the "requirement is perpetual until the law is changed." *IGNR IV*, 246 U.S. at 434. Therefore, the trial court should have granted Union Pacific's motion for summary judgment and motion to vacate the judgment based on preemption. We sustain Union Pacific's second issue.

**Laches**

In its fourth issue, Union Pacific urges that Palestine's and Anderson County's affirmative defense of laches is barred.[1]

The defense of laches precludes a plaintiff from asserting legal rights after an unreasonable delay against a defendant who changed his position in good faith and to his detriment because of the delay. *Fair v. Arp Club Lake, Inc.*, 437 S.W.3d 619, 625 (Tex. App.–Tyler 2014, no pet.); *Weaks v. White*, 479 S.W.3d 432, 438 (Tex. App.—Tyler 2015, pet. denied).

Palestine and Anderson County contend they "detrimentally changed their position" when they assumed "permanent responsibility for the maintenance of a road at the request of Union Pacific, continu[ed] to partner with the railroad in Palestine, and bas[ed] the city and county financial planning decisions on Union Pacific continuing to honor its obligations." They further urge that the twenty-five-year delay was unreasonable and impairs their ability to defend the claim because the evidence has been lost.

---

[1] Palestine and Anderson County initially raised several other affirmative defenses including limitations, waiver, equitable estoppel, and governmental immunity. However, on appeal, they rely solely on laches.

In support of their argument, Palestine and Anderson County point to the affidavit testimony of County Judge Robert Johnson. In his affidavit, Judge Johnson stated the following:

> I was happy to work with the City and the railroad to attempt to renegotiate the 1954 Agreement in 2015, when Union Pacific was considering developing the Alcoa property in the County. At the request of Union Pacific, the County incorporated a private road adjacent to UP property into the county road system and made improvements to it for Union Pacific's benefit without consideration. That road is now permanently part of the County's road system, and the County is forever responsible for its maintenance and has liability for potential claims and actions thereon.

Union Pacific ended up not developing the Alcoa property. However, Judge Johnson testified in his deposition that the road services other properties in the area. Additionally, the Alcoa plant was outside Palestine city limits, meaning there were questions as to whether any employment at that location would fulfill Union Pacific's obligations under the 1955 Judgment. Therefore, the evidence does not support Palestine's and Anderson County's argument that they took over the road in detrimental reliance on Union Pacific's promise to comply with the 1955 Judgment's obligations.

Anderson County and Palestine also claim they based "financial planning decisions" on the assumption that Union Pacific would remain in Palestine. However, they do not describe or specify what those decisions were, how they can be attributed to delay, or how they are detrimental. *See* TEX. R. APP. P. 38.1 (parties must support contention with argument and analysis showing the record and law).

Palestine and Anderson County further urge Union Pacific waited twenty-five years after the passage of the ICCTA to file suit, which constitutes unreasonable delay. However, in response to the declining demand for coal reducing its revenue stream, Union Pacific adopted a new business model in 2018 called "Precision Scheduled Railroading" (PSR). Maintaining the car shop and administrative operations in Palestine conflicts with the PSR principle of maximizing utilization of fewer assets and minimizing customized arrangements for individual customers at the expense of overall network efficiency. Therefore, Union Pacific attempted to set aside its employment obligations in federal court the next year. As a result, there is no unreasonable delay.

Because there was neither unreasonable delay nor detrimental reliance, Palestine and Anderson County did not establish the affirmative defense of laches. Therefore, it cannot support the trial court's granting of summary judgment in their favor. Further, the laches defense

cannot defeat Union Pacific's Motion for summary judgment.  We sustain Union Pacific's fourth issue.[2]

**DISPOSITION**

Having sustained Union Pacific's first, second, third, and fourth issues, we **reverse** the trial court's judgment and **render** judgment granting Union Pacific's motion for summary judgment and motion to vacate the 1955 Judgment and July 2021 injunction.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered February 22, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

---

[2] Because we hold that the trial court should have granted Union Pacific's motion for summary judgment and motion to vacate the 1955 judgment, we need not address Union Pacific's fifth issue regarding the propriety of the Citizen Committee's intervention.  *See* TEX. R. APP. P. 47.1.

16

# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**FEBRUARY 22, 2024**

**NO. 12-23-00152-CV**

**UNION PACIFIC RAILROAD COMPANY,**
Appellant
V.
**ANDERSON COUNTY, ET AL,**
Appellees

Appeal from the 369th District Court

of Cherokee County, Texas (Tr.Ct.No. 2021-060150)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the judgment be **reversed** and judgment **rendered** granting Union Pacific's motion for summary judgment and motion to vacate the 1955 Judgment and July 2021 injunction. All costs in this cause expended in this court be, and the same are, hereby adjudged against the Appellees, **ANDERSON COUNTY, ET AL,** for which let execution issue; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*